In re CVEO CORPORATION f/k/a
Converse, Inc., Debtor.

Argus Management Group, as Trustee
for the Creditors Reserve Trust,
Plaintiff,

v.

GAB Robins, Inc., and GAB Robins
North America, Defendants.

Bankruptcy No. 01–0223MFW.
Adversary No. 03–50346.

United States Bankruptcy Court,
D. Delaware.

July 7, 2005.

Jason C. Powell, Esquire, Wilmington, DE, Martin T. Fletcher, Esquire, Whiteford, Taylor & Preston, L.L.P., Baltimore, MD, for the Plaintiff.

Danielle K. Yearick, Esquire, Tybout, Redfearn & Pell, Wilmington, DE, for the Defendant.

## MEMORANDUM OPINION [1]

MARY F. WALRATH, Chief Judge.

Before the Court is the Plaintiff's Motion for Summary Judgment on its Complaint for Avoidance of Preferential Transfers and the Defendant's Reply and Cross Motion for Summary Judgment. For the reasons set forth below, the Court will deny the Cross Motions for Summary Judgment.

## I. FACTUAL BACKGROUND

On January 22, 2001, Converse, Inc. ("the Debtor") filed a petition under chapter 11. On June 6, 2002, the Court confirmed the Debtor's Second Amended Chapter 11 Plan which authorized the Creditors Reserve Trust ("the Plaintiff") to bring avoidance actions on behalf of the estate.

Prior to bankruptcy, the Debtor designed, manufactured and sold footwear. The Debtor hired Robins, North America doing business as GAB Robins, Inc. ("the Defendant") to act as a third party administrator of workers' compensation claims against the Debtor. In this capacity, the Defendant investigated, administered, managed and paid claims against the Debtor.

Pursuant to the contract between the Debtor and the Defendant, the Debtor would regularly transfer funds to the Defendant to be held in a "Loss Fund" to assure that there were sufficient funds to cover the anticipated workers' compensation claims for the succeeding 90 days. The Debtor also agreed to pay in advance any individual workers' compensation claim which exceeded $25,000. Quarterly audits were conducted, after which the Defendant would either refund any excess amounts or bill the Debtor for the shortfall. The Defendant received a monthly service fee ("the Service Fee") and reim-

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

bursement of its expenses for the services it performed for the Debtor.

On January 17, 2003, the Plaintiff filed a Complaint against the Defendant to recover alleged preferential transfers. The transfers at issue include two payments to replenish the Loss Fund totaling $47,921.61 and three Service Fees of $1,599.42 each. The Defendant answered the Complaint on February 19, 2003. On September 8, 2004, the Plaintiff filed its Motion for Summary Judgment. The Defendant filed its Reply and Cross Motion for Summary Judgment on October 8, 2004. Briefing is complete and this matter is ripe for decision.

## II. JURISDICTION

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b)(2)(F).

## III. DISCUSSION

### A. Timeliness

■ The Plaintiff contends that the Defendant's Cross Motion should be denied because it is untimely. It argues that this Court set a deadline of September 10, 2004, for all dispositive motions to be filed. The Defendant filed its Cross Motion on October 8, 2004, which the Plaintiff contends is 28 days late.

■ The Scheduling Order, however, provides that responses to dispositive motions are to be filed within 30 days. A party may include a cross motion for summary judgment in a response. E.g., Ellenberg v. Tulip Prod. Polymerics, Inc. (In re

T.B. Home Sewing Enters., Inc.), 173 B.R. 782, 785 (Bankr.N.D.Ga.1993) (finding that filing of response to motion for summary judgment and cross motion for summary judgment was appropriate); Fed.R.Civ.P. 12(b) & 56(b). The Defendant's cross motion was filed within 30 days of the Plaintiff's motion and is, therefore, timely.[2] Therefore, the Court will not dismiss the Defendant's Motion as untimely but will consider it on the merits.

### B. Standard for Summary Judgment

Summary judgment is appropriate where the moving party can demonstrate "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Bankr.P. 7056(c). In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It cannot simply reassert factually unsupported allegations contained in its pleadings. See, e.g., Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992).

The court must view the evidence in the light most favorable to the non-movant and "draw all reasonable inferences in favor of the non-moving party." Fields v. Thompson Printing Co., 363 F.3d 259, 265 (3d Cir.2004) (citation omitted).

If there is a genuine issue of material fact, the Court cannot grant summary judgment. At the summary judgment stage, the Court does not "weigh the evi-

---

**2.** Even if it was untimely, the Court is not precluded from considering the Motion. See, e.g., Supreme Beef Processors, Inc. v. Yaquinto (In re Caravan Refrigerated Cargo, Inc.), 864 F.2d 388, 393 (5th Cir.1989) (holding that court had discretion to allow an untimely cross motion for summary judgment because it may grant summary judgment sua sponte for non-moving party); Ellenberg v. Tulip Prod. Polymerics, Inc. (In re T.B. Home Sewing Enters., Inc.), 173 B.R. 782, 785 (Bankr. N.D.Ga.1993) (considering cross motion for summary judgment which was filed one day after time for filing response to motion for summary judgment because no prejudice was shown).

dence and determine the truth of the matter;" rather, it determines "whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. A material fact is one which "could alter the outcome" of the case. *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995). It is genuine when it is "triable," that is, when reasonable minds could disagree on the result. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## C. *Requirements of a Preference*

A pre-petition transfer may be avoided if the requirements of section 547(b) are met. That section provides:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
> (A) on or within 90 days before the date of the filing of the petition ...
>
> (5) that enables the creditor to receive more than such creditor would receive if—
>
> (A) the case were a case under chapter 7 of this title;
>
> (B) the transfer had not been made; and
>
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

■ "Unless each and every one of these elements is proven, a transfer is not avoidable as a preference under 11 U.S.C.

§ 547(b)." *Waslow v. The Interpublic Group of Cos. (In re M Group, Inc.),* 308 B.R. 697, 700 (Bankr.D.Del.2004) (citations omitted). *See also* 11 U.S.C. § 547(g) (placing the burden of proof on the trustee).

### 1. *Loss Fund*

#### a. *Section 547(b)(1)*

■ Section 547(b)(1) requires that the transfer be "to or for the benefit of a creditor." This requirement has been loosely construed by the courts. *See, e.g., P.A. Bergner & Co. v. Bank One, N.A. (In re P.A. Bergner & Co.),* 140 F.3d 1111, 1119 (7th Cir.1998) (finding that transfers to reimburse, in advance, a bank for anticipated draws on letters of credit were payments on behalf of creditor bank); *Rocky Mountain Ethanol Sys., Inc. v. Mann Inc. (In re Rocky Mountain Ethanol Sys., Inc.),* 21 B.R. 707, 709 (Bankr.D.N.M.1981) (finding that sheriff's levy on debtor's property was for benefit of creditor because sheriff was acting as creditor's agent).

The Plaintiff asserts that the transfers in question were made to or for the benefit of the Defendant because they were repayment of payments the Defendant had made for the Debtor on workers' compensation claims. Thus, the Plaintiff asserts that the Defendant was a creditor of the Debtor and the payments to the Loss Fund meet the requirements of section 547(b)(1).

The Defendant argues that the Loss Fund was a pre-paid account from which it drew money to pay third parties. It asserts that the creditor was the worker whose claim was paid from the Loss Fund; the Defendant was merely the administrator of that fund. Consequently, the Defendant argues that the replenishment of the Loss Fund was not a payment to or for the

benefit of itself as a creditor and does not satisfy section 547(b)(1).

On this record, the Court finds that the characterization of the payments (whether to reimburse the Defendant for claims it paid or to replenish the Loss Fund) is a material fact that is in dispute. The Court, therefore, cannot grant summary judgment to either party with respect to section 547(b)(1).

### b. *Section 547(b)(2)*

■ Section 547(b)(2) requires that the transfer be "on account of an antecedent debt" owed to the creditor. "Although the term 'antecedent debt' is not defined by the Code, a debt is 'antecedent' when the debtor becomes legally bound to pay before the transfer is made." *See, e.g., The Fonda Group, Inc. v. Marcus Travel (In re The Fonda Group, Inc.),* 108 B.R. 956, 959 (Bankr.D.N.J.1989) (citations omitted). Whether the Debtor was legally bound to pay the Defendant before the transfer was made again depends on how the Loss Fund is characterized.

The Plaintiff argues that replenishment of the Loss Fund, even if a prepayment of claims that may come due in the next quarter, was still the payment of an antecedent debt owed by the Debtor to the Defendant. The Plaintiff asserts that, under the contract, the Debtor was legally obligated to pay the Defendant when the Defendant issued an invoice, even though it was in advance of the claims being paid or services being performed.

The Defendant counters that the transfers to the Loss Fund did not represent transfers to a creditor on account of an antecedent debt under section 547(b)(2). According to the Defendant, the payments which the Plaintiff seeks to avoid were payments to replenish the Loss Fund to the original balance, not payments to satisfy a legal debt for the benefit of the Defendant. If the funds were not needed to pay workers' compensation claims in that quarter, they were repaid to the Debtor. The Defendant argues that this aspect of the parties' arrangement distinguishes this case from the typical preference case. *Cf. Fonda Group,* 108 B.R. at 959 (finding preference where travel agent paid travel expenses for debtor in advance and then sought reimbursement from debtor).

The Court finds that there is a material dispute of fact as to how the Loss Fund operated. It is therefore impossible to determine if the payments made by the Debtor were on account of an antecedent debt. The deposition testimony of the Defendant's accounts receivable manager, Donna Wright, on this point is contradictory. At one point, Ms. Wright testified that the claims were paid by the Defendant using the Debtor's money and that the repayment by the Debtor was to replenish the Loss Fund. At another point, she testified that the Loss Fund was more akin to a security deposit and that the claims were paid by the Defendant. (Dep. Tr. at pp. 27–30, 63–65.) Consequently, the Court cannot grant summary judgment to either party on this point and will reserve the issue for trial.

### c. *Section 550(a)*

■ The Defendant raises a defense under section 550(a).[3] The Defendant argues

---

**3.** Section 550(a) allows a trustee to recover a preferential transfer:

Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 547 ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made.

11 U.S.C. § 550(a)(1).

that if the Loss Fund is merely a pass-through account, then the Defendant is not an "initial transferee" of the transfers. As such, it is not a party from whom the Plaintiff may recover.

While the language of section 550(a) does not appear to present an exception to recovery of a preference under section 547, courts have held that it does provide a defense to a preference action for parties who act as a mere conduit in receiving a transfer solely for another and not for their own benefit. *See, e.g., Bailey v. Big Sky Motors, Ltd. (In re Ogden),* 314 F.3d 1190, 1196–1202 (10th Cir.2002) (holding that escrow agent which could not disburse funds without express directions was mere conduit for escrow funds); *Christy v. Alexander & Alexander of New York Inc. (In re Finley, et al.),* 130 F.3d 52, 57 (2d Cir.1997) (concluding that insurance broker which received premiums and remitted them to insurance company was mere conduit); *Lowry v. Sec. Pac. Bus. Credit, Inc. (In re Columbia Data Prods., Inc.),* 892 F.2d 26, 28 (4th Cir.1989) (holding that creditors' committee which received funds from debtor and distributed them to creditors was mere conduit); *Official Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.),* 287 B.R. 41, 46 (Bankr.D.N.J.2002) (finding insurance company which administered 401k plan for debtor was mere conduit for plan funds).

The rationale for finding that a mere conduit is not an initial transferee liable for a preference was articulated by the Second Circuit as follows: "The statutory structure confirms that the term 'initial transferee' references something more particular than the initial recipient. . . . Every Court of Appeals to consider this issue has squarely rejected a test that equates mere receipt with liability, declin-

ing to find 'mere conduits' to be initial transferees." *Finley,* 130 F.3d at 57.

The Seventh Circuit has articulated the test adopted by most courts to determine whether a party is a mere conduit or a transferee liable for the preference: "We think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded." *Bonded Fin. Servs., Inc. v. European Am. Bank,* 838 F.2d 890, 893 (7th Cir.1988). Thus, the use of this defense requires that the defendant establish that it lacked dominion and control over the transfer because the payment simply passed through its hands and it had no power to redirect the funds to its own use. *See, e.g., Finley,* 130 F.3d at 57–58; *Bonded Financial,* 838 F.2d at 893. To have dominion and control means to be capable of using the funds for "whatever purpose he or she wishes, be it to invest in lottery tickets or uranium stocks." *Richardson v. I.R.S. (In re Anton Noll, Inc.),* 277 B.R. 875, 879 (1st Cir. BAP 2002).

The Defendant argues that it lacked the requisite dominion and control over the transfers into the Loss Fund because it was acting solely as the Debtor's agent. That is, the Defendant's actions were restricted by orders from the Debtor: it could only use the funds to pay the claims of third parties. The Defendant asserts that where a party is an agent performing only ministerial tasks for another, it lacks control over the transfers and is a mere conduit. *See, e.g., Official Comm. of Unsecured Creditors v. United States Dept. of Labor, Wages & Hour Division (In re Dairy Stores, Inc.),* 148 B.R. 6, 9 (Bankr. D.N.J.1992) (finding that Department of Labor was not in dominion and control of funds it received from debtor for disburse-

ment to former employees for unpaid wages). Additionally, the Defendant notes that its lack of dominion and control over the Loss Fund is demonstrated by the fact that it was required to remit any excess funds to the Debtor.

The Plaintiff disagrees. It argues that the mere conduit defense is unavailable because the Defendant commingled the Debtor's money with other clients' money. *See, e.g., Nelmark v. Helms*, 2003 WL 1089363, at *3 (N.D.Ill.2003) (finding that commingling funds with general funds of the defendants was one factor establishing defendants' dominion and control). Furthermore, it argues that commingling trust funds creates a presumption that the money that replenishes the fund is not held in trust. *See e.g., Official Comm. of Unsecured Creditors of Columbia Gas Transmission Corp. v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 997 F.2d 1039, 1063 (3d Cir.1993) (holding that, to trace constructive trust funds, the lowest intermediate balance test does not count, as trust funds, money added to the account later).

To support this argument, the Plaintiff relies on the deposition testimony of the Defendant's accounts receivable manager, Ms. Wright. However, Ms. Wright testified that she lacked specific personal knowledge as to the accounting practices of the Defendant during the relevant time period. (Dep. Tr. at pp. 81–82.) Therefore, Ms. Wright's testimony is insufficient to support summary judgment in the Plaintiff's favor.

The Plaintiff further asserts that the contract between the parties granted the Defendant absolute and complete legal right to control the account. The contract states:

> [The Debtor] acknowledges that its claims will be paid with [the Defendant's] Funds. In lieu of compensation to [the Defendant] for the use of its funds, [the Debtor] agrees to make a substantially equivalent amount of funds available to [the Defendant] for [the Defendant's] *unrestricted use for any lawful corporate purpose.*

(*See* Addendum to Third Party Administrator Agreement, at Part D ¶ 4c; emphasis added.) The Plaintiff argues that this provision is a grant of dominion and control over the Loss Fund, rendering the Defendant more than a mere conduit. Even if the Defendant never in fact used the Loss Fund for its own purposes, the Plaintiff argues that it had dominion and control over those funds because of the contract language. *See, e.g., 718 Arch Street Assocs., Ltd v. Blatstein (In re Blatstein)*, 260 B.R. 698, 717 (E.D.Pa.2001) (holding that a party with an absolute legal right over an account, even if not exercised, has dominion and control).

The Defendant counters that, notwithstanding the language of the contract, instructions from the Plaintiff so severely restricted that language as to remove the Defendant's dominion and control over the accounts. Further, Ms. Wright did not testify that the Loss Fund was commingled with the Defendants' general corporate funds, instead she testified that it was commingled with other clients' loss funds. (Dep. Tr. at p. 82–83.) That is, all the "client" funds were placed in one account for payment of workers' compensation or other claims.

The question of the Defendant's power over the account raises a genuine issue of material fact. There is conflicting evidence concerning the extent of the Defendant's control over those funds. At the summary judgment stage, the Court cannot determine which position is correct. *See, e.g., Big Apple BMW*, 974 F.2d at 1363; *Burnham Serv. Corp. v. Pac. States Logistics Mgmt., LLC (In re Burnham*

*Holdings, Inc.)*, 2005 WL 283193, *4 (Bankr.D.Del. Feb.2, 2005). Therefore, the Court cannot grant summary judgment to either party on the "mere conduit" defense.

### 2. Service Fees

The Defendant concedes that the Plaintiff has met its burden under section 547(b) as to the Service Fees. However, the Defendant argues that the Service Fees fall under the ordinary course of business defense of section 547(c).

■■■ The Bankruptcy Code provides that a transfer may not be avoided as preferential:

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2). The defendant has the burden of proving each element of this defense. 11 U.S.C. § 547(g). *See, e.g., Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 220 (3d Cir. 1994); *M Group*, 308 B.R. at 702; *Camelot Music, Inc. v. MHW Adver. & Pub. Relations, Inc. (In re CM Holdings, Inc.)*, 264 B.R. 141, 152 (Bankr.D.Del.2000). Generally, a court will examine "the prior conduct of the parties, the common industry practice, and particularly, whether pay-

ment resulted from any unusual action by either the debtor or creditor." *Fonda Group*, 108 B.R. at 960 (citation omitted).

The Plaintiff concedes the first element (that the debt was incurred in the ordinary course of the parties' business). The Plaintiff argues, however, that the Defendant cannot meet the second and third elements of section 547(c)(2) because the Defendant has not established that the transfers in question were in the ordinary course of the parties' dealings or the industry.[4]

### a. Subjective test

■■■ "The second element of the test for ordinary course dealing is often referred to as the 'subjective test,' because it requires a showing that, as between the parties, the transfer was made in the normal course of their dealings." *CM Holdings*, 264 B.R. at 154 (citation omitted). In this case the parties focus solely on the timing of the preference payments compared with payments made in the one year before the preference period.

■■■ It is undisputed that during the year prior to the preference period, there were sixteen service fee payments. In doing its calculations, the Plaintiff excludes one service fee payment that was made on the same day as its invoice, without any explanation. It also excludes a payment of $400, because it is not clear that it is a service fee. Therefore, the Plaintiff asserts that the payments during that time were 22 to 74 days late, as opposed to the preference period where payments were 11 to 80 days late. The Plaintiff contends that these late and early payments are outside the ordinary course of business.

---

**4.** The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 has changed section 547(c)(2) to require only that a defendant establish that the transfers complied with either the industry standards or the gen-

eral practice between the defendant and the debtor. That provision, however, is not applicable to this case because it was filed before the effective date of the Act.

*See, e.g., M Group*, 308 B.R. at 702 ("although the payments in this case appear to routinely have been made late, they were made within a shorter time period during the preference period. Courts have held that early payments can be outside the ordinary course of business.") (citations omitted).

If the excluded payments are included, the range is 0 to 91 days compared to the alleged preference payments which were 11 to 80 days late. This would be within the ordinary course of the parties' business. *E.g., Official Unsecured Creditors' Comm. v. Ford Motor Credit Co. (In re Ed Jefferson Contracting, Inc.)*, 224 B.R. 740, 745 (Bankr.E.D.Mo.1998) (while pre-preference payments were irregular, they established that debtor routinely paid late).

Until it can be determined which payments made in the pre-preference period were for service fees, the proper range to which the Court should compare the preference payments cannot be established. Thus, the Court cannot determine on this record that all the payments in question were made in the ordinary course of business between the parties.

### b. *Objective test*

■ To establish the third element of the ordinary course defense, the objective test, the defendant must establish that the payments in question were made in the ordinary course of business in the parties' industry. "[O]rdinary business terms refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so unusual as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." *Big Wheel Holding Co. v. Fed. Wholesale Co. East (In re Big Wheel Holding*

*Co.)*, 223 B.R. 669, 674 (Bankr.D.Del.1998). *See also Molded Acoustical*, 18 F.3d at 224.

The Defendant relies on the deposition testimony of Ms. Wright to establish that the transfers complied with industry standards. While Ms. Wright discussed the Defendant's general practices, she made no mention of the practices in the industry as a whole in the portions of her deposition that were provided to the Court.[5] Courts have found that where a defendant presents only the party's practices and gives no general industry standards for comparison, it has not met its burden under section 547(c)(2)(C). *See, e.g., CM Holdings*, 264 B.R. at 156.

Because there is a genuine issue of material fact with respect to the general industry standard, the Court will not grant summary judgment to the Defendant but will require that the matter be tried.

### IV. *CONCLUSION*

For the reasons set forth above the Court will deny the Cross Motions for Summary Judgment.

An appropriate order is attached.

### ORDER

**AND NOW** this 7th day of **JULY, 2005,** upon consideration of the Cross Motions for Summary Judgment for Avoidance of Preferential Transfers filed by the Plaintiff and the Defendant and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Cross Motions for Summary Judgment by the Plaintiff and Defendant are **DENIED.**

---

**5.** Each party presented portions of Ms. Wright's deposition to support its arguments.

Unfortunately, the combination of the two did not include the entire deposition.